IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Sixth Cir. Docket No. 25-1540

United States of America,

                 Plaintiff-Appellee,

v.

Khaophone Sychantha,

                 Defendant-Appellant.

---

On Appeal for the United States District Court for
the Eastern District of Michigan, Southern Division, at Detroit
Hon. Sean F. Cox, Case No. 05-cr-81165-01

---

**Defendant-Appellant's Appeal Brief**

**Oral Argument Requested**

Respectfully submitted,

/s/ *Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant
The David Whitney Bldg.
One Park Avenue, Suite 1207
Detroit, MI 48226
(313) 963-4311
mmag100@aol.com

Dated: July 30, 2025

# Table of Contents           Page

Table of Authorities…………………………………………….…...................iv

Statement in Support of Oral Argument……………..............…......................vi

Statement of Subject Matter and Appellate Jurisdiction……………................1

Statement of Issues Presented……………………….…..….............…...........2

Statement of the Case……………………………………..............…...........2

Summary of Argument…………………………………….................…......18

Argument………………….........................................……..……………...19

    I.      The district court erred by finding that Defendant
               voluntarily waived his Sixth Amendment Right to Counsel........19

    II.     The district court abused its discretion by refusing to appoint
               new counsel to represent Defendant at trial in violation of the
               Sixth Amendment to the U.S. Constitution..................................22

    III.    The district court clearly erred by denying Defendant's
               motion to dismiss for violation of his Speedy Trial Right
               under the Sixth Amendment to the U.S. Constitution for
               the lengthy post-indictment delay......................................................26

    IV.    The district court erred by denying Defendant's Motion
               arguing that the court lacked jurisdiction..........................................29

    V.     The district court abused its discretion in scoring the
               Sentencing Guidelines..........................................................32

Conclusion……………………………………….…….…..………..36

Certificate of Compliance…………………………………..........…....37

Certificate of Service…………………………………………..........37

Addendum……………………………….................................38

    Designation of Relevant District Court Documents......................38

    Relevant Treaties................................................................40

# Table of Authorities

**Cases**                                                                                          **Page**

*Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)...........27

*Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686,
120 L. Ed. 2d 520 (1992)......................................................................................27

*Faretta v. California*, 422 U.S. 806; 95 S. Ct. 2525;
45 L. Ed. 2d 562 (1975)...........................................................................................5

*Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586,
169 L. Ed. 2d 445 (2007).......................................................................................33

*Godinez v. Moran*, 509 U.S. 389, 113 S. Ct. 2680 (1993).......................................5

*Iowa v. Tovar*, 541 U.S. 77, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004)...........21

*Lafler v. Cooper*, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).......5

*United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir. 1975).....................32

*United States v. Grenier*, 513 F.3d 632 (6th Cir. 2008).......................................29

*United States v. Iles*, 906 F.2d 1122 (6th Cir. 1990)...........................................23

*United States v. Jackson*, 628 F. App'x 384 (6th Cir. 2015)........................22–24

*United States v. Johnson*, 24 F.4th 590 (6th Cir. 2022)......................................19

*United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987)...................................5

*United States v. Modena*, 302 F.3d 626 (6th Cir. 2002).....................................20

*United States v. Rayyan*, 885 F.3d 436 (6th Cir. 2018)......................................33

*United States v. Schmidt*, 105 F.3d 82 (2d Cir. 1997).........................................23

*United States v. Smith*, 94 F.3d 204 (6th Cir. 1996)..........................................26

*United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974)....................................31

## United States Code

18 U.S.C. § 3231...........................................................................................1

28 U.S.C. § 1291...........................................................................................1

## U.S. Sentencing Guidelines

USSG § 2D1.1...........................................................................................33–35

USSG § 3B1..............................................................................................35

USSG §3B1.2............................................................................................34

## Treaties

*Treaty on Extradition Between the United States of America and Canada*,
Can.-U.S., Dec. 3, 1971, 1971 U.S.T. LEXIS 226, 27 U.S.T. 983.........30–31
(See relevant excerpt in the Addendum)


*Protocol Amending the Treaty of Extradition Between the United States of
America and Canada*, Can.-U.S., Jan. 11, 1988, T.I.A.S. No. 91-1126............31
(See relevant excerpt in the Addendum)

## Statement in Support of Oral Argument

Defendant-Appellant, Khaophone Sychantha, requests oral argument. Many intricate facts and the testimony of multiple witnesses were prominent issues at the district court. There are also five legal arguments addressing different legal issues argued in this brief. Oral argument would significantly aid this Court's decision.

## Statement of Subject Matter and Appellate Jurisdiction

Subject matter jurisdiction is this case was vested in the U.S. District Court for the Eastern District of Michigan upon the filing of the Superseding Indictment (RE 7), naming the United States of America as Plaintiff and Khaophone Sychantha as Defendant by virtue of 18 U.S.C. § 3231, which grants original jurisdiction to the district court over all offenses against the laws of the United States.

Appellate jurisdiction in this case was vested in this Court upon the filing of the Notice of Appeal on June 12, 2025 (RE 213) from the sentencing of Defendant Sychantha and entry of the Judgment on June 9, 2025 (RE 209), by virtue of 28 U.S.C. §1291, which grants the Circuit Court of Appeals jurisdiction to review all final decisions in the district courts.

This appeal is from a judgment disposing of all potential claims with respect to all the parties.

# Statement of Issues Presented

I.  The district court erred by finding that Defendant voluntarily waived his Sixth Amendment Right to Counsel.

II.  The district court abused its discretion by refusing to appoint new counsel to represent Defendant at trial in violation of the Sixth Amendment to the U.S. Constitution.

III.  The district court clearly erred by denying Defendant's motion to dismiss for violation of his Speedy Trial Right under the Sixth Amendment to the U.S. Constitution for the lengthy post-indictment delay.

IV.  The district court erred by denying Defendant's Motion arguing that the court lacked jurisdiction.

V.  The district court abused its discretion in scoring the Sentencing Guidelines.

# Statement of the Case

## I.  Pretrial Proceedings

A sealed Indictment was filed in this case on December 29, 2005, charging Defendant Sychantha with a single count of conspiracy to possess with intent to distribute marijuana and MDMA. (Indict., RE 3, Page ID # 5). A Superseding

Indictment was filed on October 16, 2013, charging Sychantha with four counts. (Sup. Indict., RE 7, Page ID # 14-18). The government tried Sychantha on only the following three counts:

- Count One: Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance (21 U.S.C. §§ 846, 841(a)(I), 841(b)(1)(A)(viii), (B)(vii), (viii), (C);

- Count Two: Possession with Intent to Distribute a Controlled Substance (21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)); and,

- Count Three: Possession with Intent to Distribute a Controlled Substance (21 U. S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), (B)(viii), (C)).

  [Sup. Indict., RE 7, Page ID # 14-17.]

In count one, the government alleged that the conspiracy began about May 1, 2003 and continued through January 2011 and involved codefendants David Sok, Mamie Arterberry, and Richard Arterberry. *Id.* at 14. The controlled substances in pill form were N-Benzylpiperazine, also known as "BZP," methamphetamine, 3,4 - methylenedioxymethamphetamine, also known as "ecstasy," and marijuana. *Id.* at 15.

Count two occurred on or about December 18, 2008, and count three occurred on or about January 26, 2009. *Id.* at 16-17.

Sychantha initially appeared in court on May 11, 2023. He was a Canadian citizen, originally from Laos, and according to the Probation Department, U.S. law

enforcement did not know his whereabouts. (Presentence Inv. Rpt., RE 199, Page ID # 1664). At some time around 2017 in Windsor, Canada, Sychantha was charged and convicted of a criminal offense, and he was sentenced to 900 days in jail. *Id.*

According to the probation department, when the government discovered that Sychantha was incarcerated it filed a request for his extradition. *Id.* When Sychantha's Canadian jail sentence ended around February 2019, he was held on the U.S. extradition warrant. *Id.* Sychantha challenged extradition and appealed the initial decision to extradite him. *Id.* He remained in custody until the appeal was dismissed, and he was extradited to the U.S. around March 2023. *Id.*

In contrast to the Probation Department's description of the extradition process, Sychantha has always maintained that he was kidnapped from Canada and brought to the U.S. against his will and without a proper extradition hearing and process. (Mot. New Trial, RE 200, Page ID # 1686; and Affidavit, RE 202, Page ID # 1692).

While this case was pending in the Michigan U.S. District Court, his first court-appointed attorney withdrew because Sychantha demanded a motion challenging the district court's jurisdiction based on the lack of extradition proceedings. (Mot. Withdraw, RE 78, Page ID # 185-186).

The district court appointed a second attorney who moved for a referral for a mental health evaluation based in part on Sychantha's claims about the lack of due process in his extradition from Canada. (Mot. Referral, RE 102, Page ID # 330). Sychantha was referred for evaluation, and then months later the court held a competency hearing where Sychantha stipulated that he was competent to stand trial. (Comp. Hrg. Trans., RE 164, Page ID # 1212; and Order, RE 131, Page ID # 582).

About a month before trial, at a *Lafler*[1] hearing, Sychantha orally moved on the record for new counsel because the attorney would not file a motion requested by Sychantha and because his attorney was not acting in his best interest. (*Lafler* Hrg. Trans., RE 165, Page ID # 1232-33, 1240). Sychantha told the court that he spoke with attorneys he wanted to hire, but they told him that his current counsel would have to be "fired" first. *Id.* at 1233. Sychantha also indicated that he would represent himself but was still attempting to hire a new lawyer. *Id.*

The court told Sychantha that if he represented himself, his current appointed counsel would continue as standby counsel. *Id.* at 1234. The court then conducted a *Faretta* and *McDowell*[2] colloquy with Sychantha. *Id.* at 1234-41. The

---

[1] *Lafler v. Cooper*, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).
[2] *Faretta v. California*, 422 U.S. 806; 95 S. Ct. 2525; 45 L. Ed. 2d 562 (1975); and *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987), disapproved on other grounds by *Godinez v. Moran*, 509 U.S. 389, 395 n.5, 113 S. Ct. 2680, 2684 (1993).

court found that Sychantha "knowingly and voluntarily waived his right to counsel." *Id.* at 1241-42.

## II.    The Trial

On the first day of trial, Sychantha filed a motion in limine asking for appointment of new counsel (Mot., RE 141, Page ID # 669-670); but the court denied the motion. (Trial Trans. 10/10/24, RE 157, Page ID # 829).

On the fifth day of trial, Sychantha moved to disqualify or recuse the district court Judge from the case alleging that the Judge was biased against him. (Trial Trans. 10/17/24, RE 160, Page ID # 1082-83).

The second day of trial started at about 9:03 a.m., but Sychantha did not have his notes from the previous day along with his case documents because the jail where he was held had a policy that did not allow documents or notes in an inmate's cell. (Trial Trans. 10/11/24, RE 167, Page ID # 1265, 1327–39). However, the U.S. Marshals did pick them up and delivered them to Sychantha in the middle of the trail that day around 11:02 a.m. *Id.*

The second day of trial was a Friday. When the court recessed, Sychantha was returned to the Livingston County Jail until the trial continued the following Tuesday. Over that weekend, the jail personnel had misplaced Sychantha's discovery materials, and he did not get them until about 5:00 p.m on Monday.

(Trial Trans. 10/15/24, RE 158, Page ID # 839–40, 915-918). A U.S. Marshal told the court that the jail would allow Sychantha to have access to his documents going forward. *Id.* at 961-962.

After the court recessed on the second day, Sychantha was returned to the jail but did not get his discovery until 10:00 p.m. and reviewed it until about 12:00 a.m. (Trial Trans. 10/16/24, RE 159, Page ID # 974). A Sergeant Neil from the Livingston County Sheriff's Department wrote an email to the court indicating that Sychantha could have reviewed his materials earlier around 2:45 p.m., but allegedly Sychantha refused, wanting to wait until after dinner. *Id.* at 1076. The government also indicated that Sychantha had access to most of the discovery since May 12, 2023. *Id.* at 1149.

## A.     Witness Testimony

### 1.     Lauren Oman

The government called a number of witnesses who testified about participating with Sychantha in the alleged drug trafficking conspiracy. Lauren Oman (formerly Pennington) testified that she used drugs until her sobriety date in October 2018. (Trial Trans. 10/11/24, RE 167, Page ID # 1334). Oman had a friend, John Tetreau, who introduced her to Sychantha in December 2007. *Id.* at

1335. Another codefendant, David Sok, was present when Oman first met Sychantha. *Id.* at 1336.

Oman said that Tetreau usually drove to Sychantha's residence in Windsor, Canada, where drugs like marijuana, ecstasy, and a white powder substance would be hidden in a false gas tank on Tetreau's vehicle and then transferred across the border to Detroit, Michigan. *Id.* at 1336, 1339. Oman was not in Sychantha's garage when the drugs were hidden in the vehicle. *Id.* at 1337. When they got across the border in the U.S., Tetreau would handle unpacking the vehicles and delivering the drugs. *Id.* at 1339.

Initially, Oman came along as a passenger while Tetreau drove, but later she started driving a vehicle that Tetreau purchased for her to make drug runs for Sychantha from Canada to Detroit with her boyfriend, Jacob Webb, as a passenger. *Id.* at 1340-41. Tetreau purchased a Pontiac Grand AM for Oman to drive on those runs because it had back panels that came off over vacant space between the frame where drugs could be hidden. *Id.* at 1341.

Oman said she made about 10 runs in total for Sychantha. *Id.* at 1335, 1339. Oman also testified that Sychantha directed people and gave Oman and Tetreau "spending cash." *Id.* at 1338. Sychantha had conversations with Oman about the drugs being packed in the cars, where she was to go, and how much spending money she would get. *Id.* at 1352.

On October 24, 2008, Oman was stopped and arrested while crossing the border into Detroit with Webb in the vehicle. *Id.* at 1341. Oman and Webb had picked up about 9-and-a-half pounds of marijuana from Sychantha and Sok in Windsor and drove it back across the border where it was seized. *Id.* at 1342).

Oman cooperated with law enforcement and made a recorded phone call with Tetreau, she also wore a wire to record an in-person conversation with Tetreau. *Id.* at 1334, 1345. Oman helped federal agents set up a drug run with Tetreau that would be made from Detroit to Boston. *Id.* at 1345. Tetreau told Oman that the pills he wanted delivered came from Sychantha and Sok in Windsor. *Id.* at 1346. Federal agents took the drugs and set up a false delivery in Boston. *Id.* at 1347.

At the delivery in Boston, the purchasers were arrested. *Id.* at 1349. During Oman's later recorded conversations with Tetreau, he complained that the people arrested in Boston suspected him of being in an undercover operation. *Id.* He also believed either Webb or Oman gave up Sychantha or Sok to law enforcement after they were arrested. *Id.*

The purchasers in Boston never mentioned Sychantha. (Trial Trans. 10/15/24, RE 158, Page ID # 939).

### 2. John Tetreau

John Tetreau testified that he last used drugs around 2007 or 2008, and that he was convicted of conspiracy to distribute a controlled substance in relation to this case. (Trial Trans. 10/15/24, RE 158, Page ID # 864). Tetreau said that Sychantha directed him to pick up and drop off drugs and money to transport between Canada and the U.S., and that Sychantha led the organization. *Id.* at 865–866, 885. Sychantha and Dave Sok put the false gas tank on Tetreau's vehicle, and Sok acted as Sychantha's partner and mechanic. *Id.* at 866-867.

Tetreau estimated that he transported about 10,000 to 30,000 pills each time he made a run for Sychantha, and about $20,000 to $40,000 in cash per trip every couple of weeks in 2008—although he did not count the pills or money. *Id.* at 872, 888-889. He introduced Oman to Sychantha, and she rode along as a passenger on some of his runs. *Id.* at 873-874. Tetreau confirmed that in his recorded phone call with Oman, he suspected her of working with the government. *Id.* at 878. After that, he stopped crossing the border in January 2009 and worked mainly in the U.S. and Detroit. *Id.* He helped to coordinate Oman's delivery of about 10,000 pills from Detroit to Boston because he was afraid to transport them himself. *Id.* at 879, 886. However, Special Agent Mark Koch testified that there were about 30,000 pills in the Boston delivery. *Id.* at 939.

In exchange for his testimony, the government moved the court to give Tetreau credit for his cooperation. *Id.* at 887. He faced a minimum of 10 years but served 48 months and one year of supervision. *Id.*

### 3. Donte Shavers

Donte Shavers was a cousin of Mamie Arterberry and nephew of her father, Richard Arterberry, who were both named in the Superseding Indictment. (Trial Trans. 10/16/24, RE 159, Page ID # 980; and Sup. Indict., RE 7, Page ID # 14). Shavers testified that Mamie introduced him to Sychantha at his house in Windsor, Canada, and they talked about selling ecstasy. (Trial Trans. 10/16/24, RE 159, Page ID # 980-981). David Sok worked on the cars, taking off panels to hide the drugs. *Id.* at 982. Shavers would drive to Sychantha's house in Windsor, vacuum seal the pills, put them in his vehicle, and then drive back to Detroit. *Id.* Shavers was paid a per pill fee to transport them. *Id.* at 982. Sychantha did not do the manual labor but supervised Sok and Shavers when loading the pills into the vehicles. *Id.* at 983, 994. Shavers would transport the drugs to his uncle Richard Arterberry's garage, where Richard and Mamie Arterberry would take the panels off the vehicle and remove the drugs. *Id.* at 983.

On December 18, 2008, Shavers was arrested at the border driving a vehicle with 100,000 ecstasy pills from Sychantha. *Id.* at 984; and Trial Trans. 10/15/24,

RE 158, Page ID # 894. Shavers pleaded guilty to unlawfully importing over 100,000 pills and agreed to cooperate with the government. (Trial Trans. 10/16/24, RE 159, Page ID # 987–988).

Shavers admitted that many of the details were "very fuzzy" about what happened in 2008, and that he never called Sychantha. *Id.* at 990-991.

### 4.    Tammie Thompson

Tammie Thompson testified that she transported marijuana over the border for Sychantha from Windsor to Detroit. (Trial Trans. 10/15/24, RE 158, Page ID # 847, 850. Thompson would drive to Canada, call her first husband's cousin, Timothy, when she arrived at a designated residence, drive into a garage, and stay in the vehicle while a spare tire filled with marijuana was put into the trunk. *Id.* at 850. She was paid $700 per trip. *Id.* at 853.

Thompson was arrested at the border in February 2004, taken to Hamtramck, Michigan, where spoke with Officer Vaughn and helped the police by calling her cousin Timothy to tell him where to pick up the vehicle. *Id.* When Timothy picked up the vehicle, the police arrested him. *Id.* There was about 3.8 kilos, or 9 pounds, of marijuana in her vehicle. *Id.* at 861.

### 5. Ronald Quizon

Ronald Quizon testified that he became involved with Sychantha in 2005 and 2006 agreeing to transport cash for him from the U.S. to Canada. (Trial Trans. 10/11/24, RE 167, Page ID # 1356-57). Sychantha told Quizon to use a burner phone when calling about who Quizon had to meet in the U.S. to pick up the cash. *Id.* at 1358. Quizon transferred cash about six to eight times. *Id.* at 1358. Quizon dropped off the cash to Sychantha and sometimes other people. *Id.* at 1360.

Not only did he transport cash, but Quizon would allow other individuals to leave drugs at his house to be picked up later. *Id.* Quizon said that Sychantha would call to let him know when someone was coming with pills to leave at Quizon's house. *Id.* at 1359-60.

Quizon was stopped in 2008 at the border with about $10,000 in cash and then signed a proffer agreement with the government. *Id.* at 1361, 1363.

### 6. Asad Malik

Asad Malik testified that he used to purchase 10 to 15 pounds of marijuana at a time from Sychantha at about $2,500 per pound. (Trial Trans. 10/16/24, RE 159, Page ID # 997-998). Malik received the marijuana in Michigan, but not from Sychantha. *Id.* at 998.

On one occasion in 2005, Malik arranged the purchase of 5,000 ecstasy pills from Sychantha for Malik's friend, Hammad Khan. *Id.* at 999-1000). Sychantha did not deliver the pills to Malik. *Id.* at 1001. When Malik delivered the pills to Khan, they were arrested. *Id.* at 1000. Malik then agreed to cooperate with law enforcement by making recorded calls to Sychantha. *Id.* at 1000-01.

Malik had a recorded phone conversation with Sychantha explaining that he had been arrested, and that the pills had been seized. *Id.* at 1003-04. Malik asked about the female courier who delivered the pills and whether she could be trusted, and Sychantha said she was a regular driver. *Id.* at 1004-05. Malik was not charged with any crime after his arrest. *Id.* at 1008.

### 7.    Agent Daniel Christensen

The government called Agent Daniel Christensen to testify about drug trafficking. (Trial Trans. 10/15/24, RE 158, Page ID # 944-949). Christensen said that the street value of ecstasy is about $15 to $20 dollars per pill, and that pills found in the quantities of tens of thousands to 100,000 pills are typical of high-level organizations. *Id.* at 948. Drug traffickers would also use vehicles that had space to hide drugs. *Id.* at 945.

### 8. Forensic Chemists

On September 6, 2005, DEA forensic chemist Dr. Carrie Gallagher tested pills seized during Malik's delivery to Khan on May 26, 2025. (Trial Trans. 10/15/24, RE 158, Page ID # 1023-24, 1032-34). There were three exhibits admitted at trial that had been tested, and Gallagher found the following quantities of drugs by weight:

- The pills in Exhibit 36 contained 120.3 grams of methamphetamine and ecstasy, and 4.2 grams of pure methamphetamine;

- The pills in Exhibit 37 contained 15.8 grams of ecstasy and 0.38 grams of pure methamphetamine; and,

- The pills in Exhibit 38 contained 365.4 grams of methamphetamine and ecstasy, and 10.2 grams of pure methamphetamine. [*Id.* at 1030–34.]

Gallagher only tested a "representative sample" of the total pills and admitted that she could not say whether there were different amounts of methamphetamine in the remaining pills. *Id.* at 1034-35.

Agent Timothy Anderson was a forensic chemist for the DEA who testified about the amount in weight of BZP and ecstasy in some of the additional pills seized in this case. (Trial Trans. 10/15/24, RE 158, Page ID # 1014-16). Anderson analyzed the pills in April 2009. *Id.* at 1011. There were three exhibits admitted at

trial that he had tested, and Anderson found the following quantities of drugs by weight:

- The pills in Exhibit 13 contained 597.2 grams of BZP;

- The pills in Exhibit 14 contained 620.8 grams of ecstasy and BZP; and,

- The pills in Exhibit 15 contained 609.1 grams of BZP. [*Id.* at 1014-16.]

Anderson only tested a "representative portion" of the total pills and admitted that it was possible that there were different amounts of each drug in the remaining pills. *Id.* at 1018-19.

In June 2009, forensic chemist Alexandra Ambriz analyzed more pills that were seized in this case on January 24, 2009. *Id.* at 1040, 1042. There were three exhibits admitted at trial that she had tested, and Ambriz found the following quantities of drugs by weight:

- The pills in Exhibit 33-1 contained 612.7 grams of BZP, ecstasy, and methamphetamine, and 10.3 grams of pure methamphetamine;

- The pills in Exhibit 33-2 contained 621.5 grams of BZP, ecstasy, and methamphetamine; and,

- The pills in Exhibit 34 contained 624.3 grams of BZP, ecstasy, methamphetamine, and ketamine, and 9.3 grams of pure methamphetamine. [*Id.* at 1043–45.]

Ambriz only tested a portion of the total pills, and she could not say whether all of the pills contained methamphetamine. *Id.* at 1047.

Dr. Heath Miller analyzed pills that were seized from Donte Shavers on December 18, 2008. *Id.* at 1051-53. Miller found 600.4 grams of BZP and ecstasy in Exhibit 12, which was admitted at trial. *Id.* Miller also only tested a portion of the total pills seized. *Id.* at 1054.

There was no evidence presented at trial that Sychantha's fingerprints were found on any of the bags of drugs seized or that he had ever been in the United States. (Trial Trans. 10/11/24, RE 167, Page ID # 1322; Trial Trans. 10/15/24, RE 158, Page ID # 862, 939).

The jury found Sychantha guilty on all counts, and they found that his offense in count one (conspiracy to possess with intent to distribute) involved at least 500 grams of a substance containing methamphetamine and at least 5 grams of pure methamphetamine. (Verdict, RE 152, Page ID # 765). The jury also found that Sychantha's offense in count three (possession with intent to distribute) involved at least 500 grams of a substance containing methamphetamine and at least 5 grams of pure methamphetamine. *Id.* at 766.

## Summary of the Arguments

Defendant Sychantha argues that the district court should have known that he did not voluntarily waive his right to counsel. The court knew that he was upset with his two court-appointed attorneys who would not address his improper extradition to the U.S. He was referred to for a competency evaluation, and he moved the court for new counsel before trial.

The court also abused its discretion and failed to seriously hear his motion for new counsel. His request for new counsel would have implicitly waived a speedy trial issue, and at the time he made the request for new counsel, the government would not have suffered prejudice.

Sycantha's right to a speedy trial under the Sixth Amendment to the U.S. Constitution was violated because more than 10 years of post-indictment delay passed from the time of offenses and the filing of the Superseding Indictment, and the government did not have a good reason for arresting and bringing him to court sooner.

Sychantha argues that the failures and absence of due process in his improper extradition required the court to find a lack of jurisdiction and dismiss the case. Sychantha claimed that he did not receive an extradition hearing and that he was kidnapped, restrained, and involuntarily taken from Canada by government agents.

Sychantha finally challenges the scoring of his Sentencing Guidelines, specifically, the sections related to the amount of drugs involved in the alleged conspiracy. The jury found at least 500 grams of a substance containing methamphetamine and at least 5 grams of pure methamphetamine. But the jury did not find *more* than 500 grams a substance containing methamphetamine or *more* than 5 grams of pure methamphetamine.

The court also erred by increasing Sychantha's offense level for being a leader, organizer, manager or supervisor, and it erred by failing to decrease his offense level for having a minimal or minimal role in the alleged conspiracy.

## Argument

### I.   The district court erred by finding that Defendant voluntarily waived his Sixth Amendment Right to Counsel.

**Standard of Review**

This Court reviews a challenge to the sufficiency of a *Faretta* inquiry de novo. *United States v. Johnson*, 24 F.4th 590, 600-01 (6th Cir. 2022) (citations omitted).

**Argument**

The Constitution provides that individuals facing criminal charges have the right to counsel to defend against government accusations in court. U.S. Const. amend VI. However, defendants can waive this right and represent themselves so long as the waiver of counsel is knowing, intelligent, and voluntary. *Iowa v. Tovar*, 541 U.S. 77, 81, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004).

Before allowing a criminal defendant to represent himself, a district court must conduct a colloquy substantially similar to the one set forth in the *Bench Book for United States District Judges*. *United States v. Modena*, 302 F.3d 626, 630 (6th Cir. 2002) (citation omitted).

In a pretrial hearing, Defendant Sychantha told the court that he wanted to get a new attorney because his second appointed counsel was not doing what Sychantha asked him to do—file particular motions. (*Lafler* Hrg. Trans. 9/20/24, RE 165, Page ID # 1232). Sychantha said, "I would represent myself, but I'm going to hire a new lawyer." *Id.* at 1233. Sychantha had not hired an attorney but intended to. *Id.* He spoke with attorneys, but they told him he had to fire his current attorney first. *Id.*

The court responded by stating that "[i]f you want to represent yourself— Mr. Steingold will be standby counsel—that you may consult at any time during the course of the trial." *Id.* at 1234. Sychantha said he understood that, but the court

misconstrued Sychantha's earlier statement. He was not asking to represent himself. By saying "I would represent myself," he was saying that if he could not new counsel by hiring or appointment, he would represent himself.

Part of the problem, which the court was aware of, was that Sychantha was originally from Laos. He spoke with an accent and did not have absolute command of the English language. He was also erratic and obsessive enough to warrant a prior competency evaluation. Also, during the *Faretta* and *McDowell* colloquy, Sychantha had difficulty understanding the court's explanation of the Rules of Evidence and the Rules of Criminal Procedure. *Id.* at 1238-39.

Sychantha did not waive his right to counsel voluntarily. (Affidavit, RE 202, Page ID # 1692). He did not want to represent himself; he wanted new counsel. *Id.* When the court said "you should have Mr. Steingold try the case for you," Sychantha responded by saying "[no], I know he don't have my best interest." (*Lafler* Hrg. Trans. 9/20/24, RE 165, Page ID # 1240).

Sychantha had been making that same claim about both of his attorneys throughout the proceedings. They would not investigate and file a motion arguing his claim that his extradition was invalid and that the district court did not have jurisdiction. Sychantha was not attempting to delay the trial, his request for new counsel was a renewal of a request he had been making all along.

Although the court conducted a *Faretta* colloquy, there was enough evidence for the court to know that Sychantha was not waiving his right to counsel voluntarily.

## II. The district court abused its discretion by refusing to appoint new counsel to represent Defendant at trial in violation of the Sixth Amendment to the U.S. Constitution.

### Issue Preservation

Defendant raised this issue before the district court in a motion in limine (Mot., RE 141, Page ID # 669-670), that the court denied (Trial Trans. 10/10/24, RE 157, Page ID # 829), and with an oral motion during trial to disqualify the Judge. (Trial Trans. 10/17/24, RE 160, Page ID # 1082-83).

### Standard of Review

This Court reviews a district court's refusal to appoint new counsel for an abuse of discretion. *United States v. Jackson*, 628 F. App'x 384, 386 (6th Cir. 2015) (citation omitted).

## Argument

"[W]hen an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction with his current counsel." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990) (citations omitted).

"An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *Id.* (citations omitted).

Resolution of whether Sychantha's decision to proceed pro se was voluntary hinges on whether his objections to counsel had such merit entitling him to appointment of new counsel. *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997). "If so, the decision to proceed pro se may not be said to be voluntary because it would have resulted from her being placed in a 'dilemma of constitutional magnitude,'" *id.* (citation omitted), that is, involuntarily representing himself instead of proceeding with objectionable counsel.

When reviewing a district court's decision to deny a motion for substitution of counsel, this Court considers four factors:

> [1] the timeliness of the motion; [2] the adequacy of the court's inquiry into the defendant's complaint; [3] whether the conflict between the attorney and client was so great that it resulted in a total lack of communication

preventing an adequate defense; and [4] a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

[*Jackson*, 628 F. App'x at 386-87 (6th Cir. 2015) (citation omitted).]

As for the timeliness of Sychantha's motion, it was clear at the March 1, 2024 hearing on the motion referring him for a competency evaluation that he was dissatisfied with his second appointed attorney, accused him of working for the government, and accused his attorney of referring him to a mental health evaluation because he would not take a plea. (Referral Mot. Hrg. Trans., RE 115, Page ID # 493, 499–500). There had been a breakdown of the attorney-client relationship, and because the court granted the motion for a competency evaluation, the trial was adjourned to October 10, 2024. Sychantha then made an oral motion on September 20, 2024. (*Lafler* Hrg. Trans., RE 165, Page ID # 1232).

The district court never engaged in a sufficient inquiry into Sychantha's complaint at the *Lafler* hearing, where the court found that he voluntarily waived his right to counsel. *Id.* at 1232-33.

The same conflict between Sychantha and his attorneys was serious enough to result in a total lack of communication that prevented an adequate defense. His attorney did not want to address or argue Sychantha's legal concerns. Because of his language barrier, he was not able to express himself clearly. He believed that the

virtually feckless extradition process he received, or lack thereof, denied the court jurisdiction; and because his attorney would not argue that issue by filing a motion, there was a breakdown in the attorney-client relationship that prevented communication and a chance for Sychantha to move on and consider the other issues in the case—including whether or not to plead guilty.

By requesting new counsel, Sychantha was implicitly agreeing to adjourn the trial, which likely would have been just a few months. The government would not have been harmed by an adjournment of trial at the time of the September 20, 2024 *Lafler* hearing.

Any defendant would suffer obvious prejudice by involuntarily representing himself at trial, but Sychantha suffered additional prejudice because of his inability to adequately prepare for trial because of the jail's mishandling of his notes and case documents before and during trial as discussed earlier in the *Statement of the Case* section of this Brief.

The court's summary and unconsidered decision to deny Sychantha's request for appointment of new counsel was an abuse of discretion.

**III.** **The district court clearly erred by denying Defendant's motion to dismiss for violation of his Speedy Trial Right under the Sixth Amendment to the U.S. Constitution for the lengthy post-indictment delay**.

## Issue Preservation

Defendant preserved this issue by filing a motion in the midst of trial. (Mot. Dismiss, RE 149, Page ID # 750-753). However, the court did not decide it before Sychantha was convicted and filed a notice of appeal; therefore, the court decided it did not have jurisdiction to decide the motion. (Order 12/16/24, RE 185, Page ID # 1479).

But Sychantha still preserved the issue at trial by making an oral motion argument to the court during his closing: "This case is 21 years old. This is a violation of my due process right and my speedy trial right." (Trial Trans. 10/18/24, RE 161, Page ID # 1173). The court responded by saying "[y]our due process and speedy trial is not an issue in this case." *Id.*

## Standard of Review

"In determining whether a defendant's right to a speedy trial has been violated, an appeals court reviews questions of law *de novo* and questions of fact under the clearly erroneous standard." *United States v. Smith*, 94 F.3d 204, 208 (6th Cir. 1996)

**Argument**

The Sixth Amendment guarantees a criminal defendant the right to a speedy trial. U.S. Const. Amend. VI. To determine whether a speedy trial violation has occurred, the Supreme Court has directed courts to consider four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy trial right, and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

The first factor, "[t]he length of the delay[,] is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.*

And while "the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of [each] case," *id.* at 530-31, "lower courts have generally found postaccusation delay 'presumptively prejudicial' when the delay approaches 'one year.'" *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992).

Sychantha initially appeared in this case on May 11, 2023. He argues that because the case was so old since the 2013 Superseding Indictment (RE 7), "[n]one of the witnesses recall -- recall nothing about this case because the case is 21 years old. My Constitution right has been violated over and over in this case." (Trial Trans. 10/18/24, RE 161, Page ID # 1173).

Sychantha believes there was no reason he could not have been brought to court sooner, and that there is no valid reason for the delay.

Lauren Oman had been stopped at the border on October 24, 2008 with about 9 pounds of marijuana, and she immediately began cooperating with the government. (Trial Trans. 10/15/24, RE 158, Page ID # 894).

Inspector Stuart Bertram of the Ontario Provincial Police conducted surveillance of Sychantha on December 18, 2008 and had been investigating Sychantha since 2005 or 2006. *Id.* at 905. They knew where Sychantha lived and the houses he used. *Id.* at 911. Bertram identified Sychantha as the driver of one of the cars the Canadian officers were following on December 18, 2008. *Id.* at 920. During his surveillance of Sychantha and others, Bertram called Agent Manns, who was the lead case agent in the investigation of Sychantha (Trial Trans. 10/11/24, RE 167, Page IDE # 1292), to tell him to stop the Plymouth van they had been following at the border. (Trial Trans. 10/15/24, RE 158, Page ID # 914). The driver of the van was Donte Shavers, who had about 100,000 pills in the van. (Trial Trans. 10/16/24, RE 159, Page ID # 984).

Finally, Sychantha asserted his speedy trial rights on September 30, 2024, at his competency hearing. (Comp. Hrg. Trans., RE 164, 1217-18).

The court erred by denying to give Sychantha's speedy trial argument a fair hearing at trial, and the court erred by refusing to dismiss the case.

## IV. The district court erred by denying Defendant's Motion arguing that the court lacked jurisdiction.

**Issue Preservation**

Defendant filed a motion challenging the court's jurisdiction (Mot. New Trial, RE 200, Page ID # 1686-87; and Affidavit, RE 202, Page ID # 1692), which the court denied. (Order 5/30/25, RE 208, Page ID # 1891).

**Standard of Review**

This Court reviews the denial of motions to dismiss for lack of jurisdiction by applying a clear error standard to review factual determinations and a de novo standard of review to legal determinations. See *United States v. Grenier*, 513 F.3d 632, 635-36 (6th Cir. 2008).

**Argument**

"A motion that the court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2).

Sychantha filed a pro se motion for a new trial arguing, in part, that the court lacked jurisdiction. (Mot. New Trial, RE 200, Page ID # 1686-87). Sychantha argued that "he was kidnapped from Canada and brought to the United States without being afforded an extradition hearing," and that he had not been provided a copy of the U.S. government's extradition warrant and documents. *Id.*; and

Affidavit, RE 202, Page ID # 1692, ¶ 2. Sychantha's attorney confirmed his claim about the government's warrant: "[O]ne of the things that my client has asked for is a copy of the warrant that would start the extradition proceedings. We haven't been able to find that." (Referral Mot. Hrg. Trans., RE 115, Page ID # 494).

The court construed Sychantha's motion for a new trial as a "challenge to his transfer to the United States as a "motion that the court lacks jurisdiction." (Order 5/30/25, RE 208, Page ID # 1887, citing Fed. R. Crim. P. 12(b)(2)). The court also assumed for the purposes of deciding the motion "that, as Sychantha alleges, he was transferred to the United States from Canada without formal extradition process." *Id.* at 1884, n.1.

Sychantha argued that his extradition from Canada violated article 11(3) of the extradition treaty between the United States and Canada. *Treaty on Extradition Between the United States of America and Canada*, Can.-U.S., Dec. 3, 1971, 1971 U.S.T. LEXIS 226, 27 U.S.T. 983. (See relevant portions in the Addendum). Article 11(1) of the Treaty provides as follows:

> In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel.

Sychantha asserts that the U.S. relied on this provision to provisionally arrest him in Canada before submitting the thorough formal requesting documents.

*Treaty*, art. 9(2)–(3), 1971 U.S.T. LEXIS 226, pp. 8-9, 27 U.S.T. 983. (See relevant portions in the Addendum).

However, the Treaty also states that if the requesting country does not produce the requesting documents within 60 days of arrest, then the "person arrested shall be set at liberty." *Id.* art. 11(3), 27 U.S.T. at 991, amended by *Protocol Amending the Treaty of Extradition Between the United States of America and Canada*, Can.-U.S., art. VI, at 2-3, Jan. 11, 1988, T.I.A.S. No. 91-1126. (See relevant portions in the Addendum).

Sychantha asserts that he was held beyond 60 days before the U.S. diplomatic channel produced the extradition requesting documents, in fact, he asserts that he never saw them. For those reasons, he argues that the court lacked jurisdiction.

Sychantha also relies on the Second Circuit Court of Appeals' recognition of an expanded due process analysis:

> Since Frisbie the Supreme Court, in what one distinguished legal luminary describes as a "constitutional revolution," … has expanded the interpretation of "due process." No longer is it limited to the guarantee of "fair" procedure at trial. In an effort to deter police misconduct, the term has been extended to bar the government from realizing directly the fruits of it own deliberate and unnecessary lawlessness in bringing the accused to trial.
>
> [*United States v. Toscanino*, 500 F.2d 267, 272 (2d Cir. 1974) (citations omitted).]

When there is a showing that government agents used "torture, brutality and similar outrageous conduct, or government conduct of a most shocking and outrageous character … offend[ing] those canons of decency and fairness which … 'shock the conscience,' and 'offend a sense of justice,' … due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . ." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir. 1975) (citation modified—see Bluebook Rule B5.3, 22nd Edition).

Sychantha argues that because of the U.S. government's delay in presenting its requesting documents, his being held beyond 60 days and longer without a proper extradition process and hearing, and by the physical handcuffing and involuntary removal of him from Canada, he has satisfied the standard set in *Toscanino* and *Lujan*.

## V.    The district court abused its discretion in scoring the Sentencing Guidelines.

## Issue Preservation

Defendant filed objections to the scoring of the Sentencing Guidelines, which the court denied at sentencing. (Sent. Memo., RE 204, Page ID # 1721, 1723, 1725, 1727, 1729, 1731, 1737, 1739, 1743).

## Standard of Review

This Court reviews a district court's calculation of the guidelines for an abuse of discretion, while factual findings are reviewed for clear error, and legal conclusions de novo. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citation omitted).

## Argument

A district court must properly calculate the guidelines range. *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007).

### A.    The Drug Quantity and Base Offense Level Calculation

Sychantha challenges the court's scoring of USSG § 2D1.1(a)(5) and (c)(2), which provides in this case that the base offense level is specified in the Drug Quantity Table. (Sent. Memo., RE 204, Page ID # 1721, 1723). The court found that Sychantha was accountable for 31588.62 kg of Converted Drug Weight, which results in a base offense level of 36.

However, the jury found Sychantha guilty of offenses involving "at least" 500 grams of a controlled substance containing a detectable amount of methamphetamine. (Verdict, RE 152, Page ID # 765–766). The jury did not find more than 500 grams. Also, the jury was not asked in the verdict form to specifically find whether Defendant was guilty of offenses involving

3,4-Methylenedioxymethamphetamine/MDMA or N-Benzylpiperazine (BZP).

Therefore, Defendant's base offense level should be 30:

| **Drug Type** | **Drug Quantity** | **Marihuana Equivalency** |
|---|---|---|
| Methamphetamine | 500 grams | 1,000 kg |

[USSG §2D1.1, Application Note (8)(D) - Drug Conversion Tables: 1 gm of methamphetamine = 2 kg of marihuana.]

| | Total Converted Drug Weight | 1,000 kg |
|---|---|---|

USSG §2D1.1(c)(5) provides that the offense level should be 30 if "[a]t least 1,000 KG but less than 3,000 KG of Converted Drug Weight." Accordingly, Sychantha maintains that the base level from what the jury decided is level 30.

## B. Adjustment for a Mitigating Role Under USSG § 3B1.2

Sychantha objected to being assessed two levels under USSG § 2D1.1(b)(5)(A)–(B), which provides that the offense level specified in the Drug Quantity Table is used "except that if (A) the defendant receives an adjustment under §3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is … (ii) level 34 or level 36, decrease by 3 levels . . . ." (Sent. Memo., RE 204, Page ID # 1725).

USSG § 3B1.2 provides that "[b]ased on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels . . . ."

The jury did not specifically find that Sychantha imported MDMA/ecstasy or BZP or that he manufacture the same, and there was insufficient evidence in the record to support such an assessment. Sychantha believes that he was entitled to a decrease in the offense level under USSG § 2D1.1(b)(5)(A)–(B) by 4 levels. Even if this Court finds that the offense level should have been 40, it should have been decreased to 36.

### C.    Leader, Organizer, Manager, or Supervisor

Sychantha objected that he is not a leader, organizer, manager or supervisor under USSG § 3B1.1(c), and therefore, his base offense level should not have been increased by 2 levels. (Sent. Memo., RE 204, Page ID # 1727). Sychantha argued that he had a minimal role and never entered the U.S.

In fact, everyone else in the case played an equal role. John Tetreau recruited and introduced Lauren Oman to Sychantha. (Trial Trans. 10/11/24, RE 167, Page ID # 1335). Will Mai, a drug dealer and the brother of Quizon's girlfriend, recruited and introduced Ronald Quizon to Sychantha. *Id.* at 1356-57. Ron Quizon recruited John Tetreau and introduced him to Sychantha. (Trial Trans. 10/15/24, RE 158, Page ID # 867). Mamie Arterberry introduced Donte Shavers to Sychantha. (Trial Trans. 10/16/24, RE 159, Page ID # 980). And Asad Malik knew Sychantha since high school. *Id.* at 996.

The court scored the Sentencing Guidelines, which resulted in a total offense level of 40 and a criminal history category of I. That is a guideline range of 292 months to 365 months.

Based on Sychantha's objections, the offense level should have been 30 and a criminal history category I, which results in a guideline range of 97 months to 121 months, much lower than his 240-month sentence. (Judgment, RE 209, Page ID # 1894).

## Conclusion

WHEREFORE, for the foregoing reasons Defendant-Appellant respectfully requests this Honorable Court to reverse, set aside the conviction and dismiss the indictment; or alternatively, reverse, set aside the conviction and remand this matter to the district court for a new trial.

Respectfully submitted,

/s/ *Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant
The David Whitney Bldg.
One Park Avenue, Suite 1207
Detroit, MI 48226
(313) 963-4311
mmag100@aol.com

Dated: _____

## Certificate of Compliance with Rule 32(a)(7)

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains no more than 13,000 words (proportionally spaced 14.5-point font Garamond), excluding the items of the Brief exempted by Fed. R. App. P. 32(a)(f) and 6 Cir. R. 32(b)(1). According to the word count tool of the word-processing software used (Microsoft Word 2016 for Mac), there are **7,516 words** in the relevant parts of the brief.

/s/ *Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant

## Certificate of Service

I certify that on July 30, 2025, I electronically filed the above Appeal Brief of Defendant-Appellant with the Clerk of the U.S. 6th Circuit Court of Appeals using the electronic file system, which will send notification of such filing to the parties of record.

/s/ *Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant

# Addendum

## Designation of Relevant District Court Documents
## U.S. Eastern District Court Case No. 05-cr-81165-01

Under 6 Cir. R. 28(b)(1)(A)(i) and 6 Cir. R. 30(g)(1), Defendant-Appellant

designates as relevant the following documents available in the district court's

record:

| Record Entry No. | Document | Page ID Range |
|---|---|---|
| RE 3 | Indictment | 5 |
| RE 7 | Superseding Indictment | 14–18 |
| RE 78 | Motion to Withdraw | 185–186 |
| RE 102 | Mot. for Mental Health Referral | 330 |
| RE 115 | Mot. for Referral Hrg. Trans. | 493–494, 499–500 |
| RE 141 | Def. Mot. New Counsel | 669–670 |
| RE 149 | Def. Mot. to Dismiss | 75–753 |
| RE 152 | Verdict Form | 765–766 |

| | | |
|---|---|---|
| RE 157 | Trial Trans. 10/10/24 | 829 |
| RE 158 | Trial Trans. 10/15/24 | 839–840, 847, 850, 853, 861, 862–867, 872–874, 878–879, 885, 887, 894, 905, 911, 914–918, 920, 939, 944–949, 961–962, 1011, 1014–16, 1018–19, 1023–24, 1032–35, 1040, 1042–45, 1047, 1051–54 |
| RE 159 | Trial Trans. 10/16/24 | 974, 980–984, 987–988, 990–991, 996–1004, 1008, 1076, 1149 |
| RE 160 | Trial Trans. 10/17/24 | 1082–83 |
| RE 161 | Trial Trans. 10/18/24 | 1173 |
| RE 164 | Competency Hrg. Transcript | 1212, 1217–18 |
| RE 165 | Lafler Hrg. Transcript | 1232–42 |
| RE 167 | Trial Trans. 10/11/24 | 1265, 1292, 1322, 1327–42, 1345–47, 1352, 1356–61, 1363 |
| RE 185 | Order Deny Mot. to Dismiss | 1479 |

| | | |
|---|---|---|
| RE 199 | Presentence Investigation Rpt. | 1664 |
| RE 200 | Motion for New Trial | 1686–87 |
| RE 202 | Defendant's Affidavit | 1692 |
| RE 204 | Def. Sentencing Memo. | 1721, 1723, 1725, 1727, 1729, 1731, 1737, 1739, 1743 |
| RE 208 | Order Deny Mot. New Trial | 1884, 1887, 1891 |
| RE 209 | Judgment | 1894 |
| RE 213 | Notice of Appeal | no page cited |

## Relevant Treaties

***Treaty on Extradition Between the United States of America and Canada***,
Can.-U.S., Dec. 3, 1971, 1971 U.S.T. LEXIS 226, 27 U.S.T. 983:

\* \* \*

ARTICLE 9

(1) The request for extradition shall be made through the diplomatic

channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers. (Emphasis added).

\* \* \*

## ARTICLE 11

(1) In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or
the person sought been convicted, in the territory of the requested State.

(2) On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3) A person arrested shall be set at liberty upon the expiration of **forty-five days** from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received. (Emphasis added)

\*    \*    \*

***Protocol Amending the Treaty of Extradition Between the United States of America and Canada***, Can.-U.S., art. VI, at 2-3, Jan. 11, 1988, T.I.A.S. No. 91-1126:

\*    \*    \*

ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of **sixty days** from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received." (Emphasis added)

\*    \*    \*